IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

IVAN RODRIGUEZ,            )
                           )
    Plaintiff,             )
                           )
vs.                        )
                           )    No. 12-cv-2277 JTF-tmp
THE CHARLES SCHWAB CORPORATION, )
                           )
    Defendant.             )

_____

REPORT AND RECOMMENDATION
_____

Before the court by order of reference is defendant The Charles Schwab Corporation's ("Charles Schwab") Motion to Dismiss or Stay Pending Arbitration. (ECF Nos. 8,9.) Plaintiff Ivan Rodriguez filed a response in opposition, to which Charles Schwab filed a reply. For the reasons below, it is recommended that Charles Schwab's motion be granted.

## I. PROPOSED FINDINGS OF FACT

On March 21, 2012, Ivan Rodriguez filed a complaint in the Circuit Court of Shelby County against his former employer, Charles Schwab.[1] According to the complaint, Rodriguez began working for Charles Schwab, a brokerage firm, in March 2000 as a registered securities representative at a branch office in Germantown,

---

[1] Charles Schwab states in its motion to dismiss that Rodriguez's actual employer was Charles Schwab & Co., Inc., a subsidiary of the named defendant, The Charles Schwab Corporation.

Tennessee. In 2001, Charles Schwab announced plans to create the Schwab Private Client ("SPC") service, an in-house, fee-based advisory service. The SPC service was created to cater to high income clients who wanted to purchase personalized investment advice from Charles Schwab. The SPC service was marketed as a sell-and-service program, which meant that the representative who sold the client the service would also be responsible for the overall management of the client's portfolio. These Charles Schwab advisors were referred to as Private Client Consultants ("PCC"), and functioned as the branch manager. In May 2002, Rodriguez became a PCC at the Germantown branch office. As a PCC, Rodriguez provided advisory services to clients, which at that time included, among other services, meeting with clients in person, addressing investment needs which included providing trade recommendations for both mutual funds and individual securities, reviewing clients' portfolios on a quarterly basis, and providing unlimited investment advice.

Rodriguez alleges that between 2002 and 2004, Charles Schwab created a new advisory service called the Advised Investing Service ("AIS"), which was substantially less expensive than the SPC service, involved telephone-based investment advice, utilized more standardized portfolios with a focus on mutual funds as opposed to individual securities, was limited to only two advisory sessions per year, and offered its clients fewer recommendations per session

as compared to SPC clients. Toward the end of 2005, Charles Schwab began making substantial changes to its SPC service, including merging the roles of PCC and non-PCC representatives. Rodriguez, along with other PCCs, were concerned about the changes being made to the SPC service. Rodriguez drafted a paper titled "Schwab Private Client: A Vital Resource in the Campaign to Dramatically Expand Our Advised and Independent Investing Business" ("Paper"), in which he expressed his belief that the merger of the PCCs and non-PCCs "could lead to a progressive de-valuation of the SPC client experience." Rodriguez shared his Paper with upper management, including Warren Brashear (his Branch Manager), Ted Plomgren (Regional Branch Executive), and Steve Anderson (Senior Vice President for Investor Services). Shortly thereafter, Rodriguez participated in a conference call with Brashear and Plomgren regarding the Paper. In spite of Rodriguez's concerns, in 2006, Charles Schwab announced the merger of the roles of PCCs and non-PCC registered securities representatives. As a result, all of these representatives received the title of Financial Consultant and were authorized to sell SPC services.

According to Rodriguez, SPC clients continued to pay the higher fees required under the SPC service plan but began receiving services similar to AIS clients. Although he received pressure from Charles Schwab to reduce the services provided to his SPC clients, Rodriguez continued to provide the kinds of services that

he promised his clients when they initially enrolled in the SPC service. During a meeting in December 2010, Brashear informed Rodriguez that he would no longer be able to participate in the advisory process for his SPC clients, and that his clients would be reassigned to a telephone-based advisor, John Turner. In March 2011, Rodriguez reviewed a draft of a portfolio consultation document that Turner had prepared for an SPC client. Rodriguez discovered that one of the recommendations made by Turner would have caused the client to incur a $22,000 capital gains tax liability. Rodriguez immediately brought this error to the attention of Brashear, at which time Rodriguez made numerous comments about his concerns regarding the diminished services being provided to SPC clients. On March 9, 2011, Rodriguez was notified that the company was investigating him regarding four allegations of misconduct. In late March 2011, he was terminated for two of those alleged acts of misconduct: (1) preparing recommendations to help a client rebalance her 401(k) account, which constituted "providing advice on assets outside of the firm," and (2) sending emails to 30 to 35 clients and colleagues inviting them to a musical production which Rodriguez was performing in, which exceeded the limit of 25 that Charles Schwab allowed without prior approval.

In his complaint, Rodriguez contends that his termination was in retaliation for his complaints to management about his concerns

regarding the diminished services provided to SPC clients. He claims that "Defendant's stated grounds for Plaintiff's termination are pretextual," and that the real reason he was terminated was because he refused to participate in and threatened to no longer remain silent about "Defendant's violation(s) of the [Dodd-Frank Wall Street Reform and Consumer Protection Act], the Federal Trade Commission Act, and Defendant's breaches of fiduciary duty." Rodriguez alleges that Charles Schwab's actions constitute retaliatory discharge in violation of Tennessee law, T.C.A. § 50-1-304.[2] He does not contend that his termination was in violation of any federal laws.

After removing this case to federal court on the basis of diversity jurisdiction, Charles Schwab filed the instant motion to dismiss or stay the case pending arbitration. Charles Schwab asserts that Rodriguez previously agreed to arbitrate any dispute, including employment disputes, involving Charles Schwab in accordance with the Financial Industry Regulatory Authority ("FINRA") rules.[3] Rodriguez allegedly agreed to arbitration when

---

[2]T.C.A. § 50-1-304(b) states that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Section (d) provides a cause of action against an employer for retaliatory discharge.

[3]FINRA is an organization designed to self-regulate broker dealer firms and investment banks dealing in over-the-counter market transactions. FINRA has established a set of rules which its industry members must follow. P & M Corporate Fin., LLC v. Paparella, No. 2:10-cv-10448, 2010 WL 4272829, at *1 (E.D. Mich.

-5-

he signed a Uniform Application for Securities Industry Registration or Transfer, or "Form U-4," when he was hired by Charles Schwab in 2000. A Form U-4 is required by all registered securities representatives as a condition of employment and as a condition of maintaining the ability to conduct securities business under both federal and state law. Rodriguez's Form U-4, a copy of which is attached to the motion to dismiss, contains the following arbitration provision:

> 5. I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs [self-regulatory organizations] indicated in item 11 [i.e. FINRA] as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

In response, Rodriguez cites FINRA Rule 13201(b) and the Dodd-Frank Act, arguing that his retaliatory discharge dispute, which arose as a result of his whistleblowing activities, is exempt from arbitration.

## II. PROPOSED CONCLUSIONS OF LAW

The Federal Arbitration Act's ("FAA") principal purpose is to "'ensur[e] that private arbitration agreements are enforced according to their terms.'" AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1748 (2011) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989)).

---

Oct. 22, 2010).

Section 2 of the FAA states in relevant part:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The Supreme Court has described this provision "as reflecting both a liberal federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract." Concepcion, 131 S. Ct. at 1745 (internal quotation marks and citations omitted). "The FAA places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms." Rent-A-Center, West, Inc. v. Jackson, 130 S. Ct. 2772, 2776 (2010) (citing Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006) and Volt Info., 489 U.S. at 478). The saving clause in § 2, however, "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." Concepcion, 131 S. Ct. at 1746 (quoting Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)).

A district court considering a motion to compel arbitration has four tasks: (1) it must determine whether the parties agreed to arbitrate; (2) it must determine the scope of that agreement;

(3) if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and (4) if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration. Fazio v. Lehman Bros., Inc., 340 F.3d 386, 392 (6th Cir. 2003).

Rodriguez does not dispute that he signed the Form U-4 when he began employment with Charles Schwab, that the Form U-4 contains the above-quoted arbitration provision, and that the arbitration provision incorporates FINRA's rules regarding mandatory arbitration. FINRA Rule 13200(a) requires that "a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons." FINRA Rule 13200(a); see also P & M Corporate Fin., LLC, 2010 WL 4272829, at *2 (quoting FINRA Rule 13200(a)). FINRA Rule 13100 defines an "associated person" as "a person associated with a member"; defines a "person associated with a member" as "a natural person who is registered or has applied for registration under the Rules of FINRA" and that "a person formerly associated with a member is a person associated with a member"; and defines a "member" as "any broker or dealer admitted to membership in FINRA . . . ." FINRA Rule 13100(a),(o),(r). It is undisputed that Charles Schwab is a brokerage firm admitted to membership in FINRA

-8-

and that at all relevant times, Rodriguez, as a registered securities representative of Charles Schwab, was an associated person. It is also undisputed that Rodriguez's retaliatory discharge claim arises out of his business activities with Charles Schwab. See French v. Wells Fargo Advisors, LLC, No. 5:11-cv-246, 2012 WL 479961, at *5 (D. Vt. Feb. 14, 2012) (citing SEC Release No. 34-56208, 72 Fed. Reg. 45077-02, 45078 (Aug. 6, 2007)) (The term "business activities" encompasses a dispute arising from the employment or termination of an associated person). Similar arbitration provisions have been held to constitute enforceable agreements to arbitrate. See, e.g., PFS Invs., Inc. v. Imhoff, No. 11-10142, 2011 WL 1135538, at *6 (E.D. Mich. Mar. 25, 2011) (concluding that employee who signed Form U-4 had entered into an agreement to arbitrate disputes with his employer); Pippenger v. Merill Lynch, Pierce, Fenner & Smith Inc., No. 1:09-CV-167, 2009 WL 2244613, at *2 (E.D. Tenn. July 29, 2009) (finding that Form U-4 contained mandatory arbitration provision requiring plaintiff to arbitrate all claims raised in the litigation).

Next, the court must determine if federal statutory claims have been asserted, and if so, whether Congress intended the claims to be nonarbitrable. Fazio, 340 F.3d at 392. The complaint alleges retaliatory discharge in violation of Tennessee law. Although Rodriguez asserts that Charles Schwab terminated him because he was going to disclose violations of the Dodd-Frank Act

and the Federal Trade Commission Act, he has not brought a claim under any federal statute.

Rodriguez contends that the court should not enforce his arbitration agreement in light of the recent amendment to FINRA Rule 13201 and the Dodd-Frank Act. FINRA Rule 13201(b), which went into effect on May 21, 2012, provides as follows:

> A dispute arising under a whistleblower statute that prohibits the use of predispute arbitration agreements is not required to be arbitrated under the Code. Such a dispute may be arbitrated only if the parties have agreed to arbitrate it after the dispute arose.

FINRA Rule 13201(b). This rule does not bar arbitration of Rodriguez's claim because Tennessee's anti-retaliation statute, T.C.A. § 50-1-304, does not prohibit the use of predispute arbitration agreements. Rodriguez's reliance on the Dodd-Frank Act is also misplaced. Until 2010, complaints alleging a violation of whistleblower protection in the Sarbanes-Oxley Act of 2002 could be subject to arbitration. See Guyden v. Aetna, Inc., 544 F.3d 376, 384 (2d Cir. 2008) ("Because we find no inherent conflict between the purpose of [the Sarbanes-Oxley Act] whistleblower protection provision and mandatory arbitration, we hold that such claims are arbitrable."). However, in 2010, Congress passed the Dodd-Frank Act, which amended the Sarbanes-Oxley Act to bar the arbitration of whistleblower claims.[4] Pub. L 111–203. Title IX, §§ 922(b)-(c),

---

[4]An employee seeking relief under the Sarbanes-Oxley Act must first file a complaint with the Occupational Safety and Health Administration of the Department of Labor ("OSHA"), the agency with

929A, July 21, 2010, 124 Stat. 1848, 1852. The Sarbanes-Oxley Act now provides that "[n]o predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under [the Sarbanes-Oxley whistleblower protection provision]." 18 U.S.C. § 1514A(e)(2). However, Rodriguez has not brought any Sarbanes-Oxley whistleblower claims (or for that matter, claims under the Dodd-Frank Act), and his state law claim does not "arise under" the Sarbanes-Oxley whistleblower protection provision. See Holmes v. Air Liquide USA, LLC, No. 12-20129, 2012 WL 5914863, at *2 (5th Cir. Nov. 26, 2012) (holding that because plaintiff did not bring any claims under the Dodd-Frank Act, her arbitration agreement did not "require[] arbitration of a dispute arising under [Sarbanes-Oxley]"; thus, the Dodd-Frank Act did not invalidate the arbitration agreement).

Finally, because all claims raised in this litigation are subject to arbitration and there are no other claims before this court, it is recommended that Rodriguez's complaint be dismissed without prejudice. See Ozormoor v. T-Mobile USA, Inc., 354 F.

---

delegated authority to receive such complaints. 29 C.F.R. § 1980.103(c) (1998); see 18 U.S.C. § 1514A(b)(1)(A) (2006). A federal court may not hear a Sarbanes-Oxley claim that is not first submitted to OSHA, see, e.g., Willis v. Vie Fin. Grp., Inc., No. Civ. A. 04-435, 2004 WL 1774575, at *6 (E.D. Pa. Aug. 6, 2004), and can only conduct *de novo* review of those Sarbanes-Oxley claims that have been administratively exhausted. See Fraser v. Fiduciary Trust Co. Int'l, No. 04 Civ. 6958, 2005 WL 6328596, at *6 (S.D.N.Y. June 23, 2005). There is no indication that Rodriguez ever filed a complaint with OSHA, much less administratively exhausted his claim.

App'x 972, 975 (6th Cir. 2009); Green v. Ameritech Corp., 200 F.3d 967, 973 (6th Cir. 2000); Arnold v. Arnold Corp., 920 F.2d 1269, 1275 (6th Cir. 1990); Braverman Props., LLC v. Boston Pizza Rests., LP, No. 1:10-cv-941, 2011 WL 2551189, at *8 (W.D. Mich. June 27, 2011); Dietz v. Allied Home Mortg. Capital Corp., No. 10-12610, 2010 WL 4286193, at *4 (E.D. Mich. Oct. 26, 2010); Bd. of Trs. of Metro-Health Sys. v. EraMED, LLC, No. 1:09 CV 2645, 2010 WL 3239011, at *7 (N.D. Ohio Aug. 16, 2010); Shammami v. Broad St. Sec., Inc., 544 F. Supp. 2d 585, 588 & n.6 (E.D. Mich. 2008); Prude v. McBride Research Labs., Inc., No. 07-13472, 2008 WL 360636, at *7 (E.D. Mich. Feb. 8, 2008).

## III. RECOMMENDATION

For the reasons above, it is recommended that Charles Schwab's motion be granted, the parties be compelled to arbitrate this matter, and the case be dismissed without prejudice.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

January 29, 2013
Date

**NOTICE**
**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**